UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
**OLIVIER KAMBALA WA KAMBALA,**     )
                                    )
    **Plaintiff,**              )
                                    )
    **v.**                      )    Case No. 17-cv-00451 (APM)
                                    )
**CHECCHI & COMPANY**               )
**CONSULTING, INC., et al.**        )
                                    )
    **Defendants.**             )
_____ )

## MEMORANDUM OPINION AND ORDER

**I.    INTRODUCTION**

Days after a heated argument with a colleague, Plaintiff Olivier Kambala wa Kambala was fired from his position with Defendant Checchi and Company Consulting, Inc., a consulting firm based in Washington, D.C., that performs international development work. Defendant retained Plaintiff to play a key role in administering a contract that the United States Agency for International Development awarded to Defendant to implement a project in Mali. Plaintiff is a citizen of Congo and worked exclusively in Mali.

Plaintiff alleges that Defendant fired him because of his race and national origin, in violation of federal and District of Columbia law, and that his termination breached the terms of his employment. In addition, Plaintiff alleges that Defendant defamed him by telling foreign government officials and non-profit workers that Plaintiff was fired because he assaulted a superior. Defendant seeks judgment on the pleadings on these claims. For the reasons that follow, Defendant's partial motion for judgment on the pleadings is granted in part and denied in part.

## II. BACKGROUND

### A. Factual Background

#### 1. *Terms of Plaintiff's Employment*

This case originates out of a contract awarded to Defendant Checchi and Company Consulting, Inc., to administer a project for the United States Agency for International Development ("USAID") in Mali, known as the Mali Justice Project ("Project"). *See* Second Am. Compl., ECF No. 20 [hereinafter Second Am. Compl.], ¶¶ III, XI; Def.'s Answer, ECF No. 21 [hereinafter Answer], ¶ III. The terms of Defendant's contract with USAID are contained in a "Task Order" signed by Checchi Vice President James L. Agee and a USAID representative. *See* Second Am. Compl. ¶ XI; Second Am. Compl., Ex. 1, ECF No. 20-1 [hereinafter Pl.'s Exs.], at 7–8.[1] Under the terms of the Task Order, the Mali Justice Project was to commence on December 8, 2015, and run for three to five years. Pl.'s Exs. at 7; *see* Second Am. Compl. ¶ XVIII n.3.

In or around December 2015, Defendant hired Plaintiff Oliver Kambala wa Kambala, a citizen of Congo who is black, to help run the Project. Second Am. Compl. ¶¶ I, III, XXXI(c); *see* Pl.'s Exs. at 1–7. The parties entered into a written "Employment Agreement," dated December 11, 2015, that memorializes the terms of Plaintiff's employment. Pl.'s Exs. at 1. Signed by Plaintiff and Agee, the Employment Agreement assigned Plaintiff the position of "Deputy Chief of Party/Component 2 Leader" for a term of one year, beginning January 4, 2016, although the contract could be extended by mutual agreement. *Id*. at 1, 5.

This case turns on two provisions of the Employment Agreement. The first is Article 8 of the Employment Agreement, titled "Termination Conditions," which lists the conditions under which Defendant or Plaintiff could terminate their relationship. *Id*. at 2–3. The Article contains

---

[1] All pincites to Plaintiffs' exhibits, which are attached to his Second Amended Complaint, are to the CM/ECF-generated page number.

four subsections. The first three set forth specific circumstances under which either Defendant or Plaintiff could end their arrangement, for example, if Defendant did not pay Plaintiff, if Plaintiff violated a rule of conduct contained in the Task Order, or if USAID requested a personnel change. *Id*. None of those three subsections are pertinent to the parties' dispute, however. The key subsection is the final one, 8(D), which grants both parties the power to terminate the relationship "with or without cause by written notice of at least thirty (30) days in advance." *Id.* at 3. Defendant would invoke subsection 8(D) some 10 months later when it terminated Plaintiff. Answer ¶ XIX.

The second critical provision of the Employment Agreement is Article 14, titled "Controlling Instruments." Pl.'s Exs. at 4. That Article makes clear that the "Prime Contract"—that is, the Task Order under which USAID hired Defendant—also potentially contains terms that governed Plaintiff's employment. Article 14 states, in relevant part: "In the event of a conflict between the Prime Contract and this Agreement, the Prime Contract shall control." *Id*. The Task Order, as it turns out, contains a provision that addresses the termination of certain key employees, including Plaintiff. *Id.* at 8. Clause F.7, titled "Key Positions/Personnel Requirements," states that certain positions and persons named to those positions are "considered essential to the successful implementation of the contract." *Id*. The Clause goes on to state:

> Prior to replacing any of the specified individuals, the Contractor must notify both the CO and the COR reasonably in advance and as soon as possible, and must submit written justification (including proposed substitutions) in sufficient detail to permit evaluation of the impact on the contact. No replacement will be made by the Contractor without the written consent of the Contracting Officer.

*Id*. Plaintiff is expressly identified as a "key" person whose potential removal is subject to the terms of Clause F.7.

3

## 2. *Plaintiff's Termination*

Plaintiff moved from South Africa to Mali to begin work for Defendant, and took steps to relocate his wife and children to Mali as well. Second Am. Compl. ¶¶ XV, XVI. During his tenure, Plaintiff was involved in an altercation with a white, French co-worker, Francis Saudubray. Second Am. Compl. ¶¶ XIX, XX; Answer ¶¶ XIX, XX. As Plaintiff tells it, Saudubray "stormed into [Plaintiff's] office" on October 13, 2016, and began "insulting [Plaintiff], claiming that [Plaintiff] was incompetent" because he had not invited Saudubray to a recent work meeting. Second Am. Compl. ¶ XX. Saudubray "pointed his hands at [Plaintiff's] face, shouting at [him] and calling [him] all sorts of names." *Id*. When Plaintiff asked Saudubray to leave, "[a]n altercation occurred between" the two. *Id*.

Saudubray evidently reported a different story to Defendant, claiming that Plaintiff assaulted him. *Id*. ¶ XX; Answer ¶ XX. This prompted Defendant to dispatch Senior Project Manager Kelly Gavagan from its District of Columbia office to Mali on October 17, 2016. Second Am. Compl. ¶ XXV; Answer ¶¶ XIX, XXV. Gavagan interviewed Plaintiff and others who were aware of the incident, though Gavagan did not speak to everyone that Plaintiff suggested might have relevant information. Second Am. Compl. ¶ XXV; Answer ¶ XXV.

Defendant fired Plaintiff soon after. On October 19, 2016, Gavagan told Plaintiff that Defendant's "Main Office in D.C. [had] decided to terminate [Plaintiff's] employment agreement," effective the very next day. Second Am. Compl. ¶ XXVIII; Answer ¶ XXVIII. A termination letter, on company letterhead, dated October 20, 2016, signed by Agee and bearing Defendant's Washington D.C. address, followed Gavagan's notification of termination. *Id*. ¶ XXIX; Answer ¶ XXIX; Def.'s Errata, ECF No. 23, Attach. 1, ECF No. 23-1 [hereinafter Termination Letter]. The letter stated that Defendant was firing Plaintiff, effective immediately,

pursuant to Article 8(D)—the at-will provision—of the parties' Employment Agreement. *Id.* ¶ XXIX; Answer ¶ XXIX; Termination Letter. The letter did not explicitly state that Plaintiff had been fired because of the altercation with Saudubray, nor did it reference the incident. Termination Letter; *see also* Answer ¶ XXXI(b) ("Checchi Consulting admits that it terminated Plaintiff's employment in accordance with Article 8(D) of the Employment Agreement and that it disciplined no one for what transpired between Plaintiff and [Francis] Saudubray.").

Defendant allegedly then told others about Plaintiff's termination. According to Plaintiff, at a November 25, 2016, Rule of Law meeting at the Dutch Embassy in Bamako, Mali, an unnamed "Checchi representative" "communicated about [Plaintiff's] departure from Mali as a result (1) of [Plaintiff] beating up [his] superior and (2) being terminated by the employer for that reason." Second Am. Compl. ¶ XXXIII(a). A "dozen" representatives from embassies, countries, aid organizations, and the United Nations attended the meeting, although Plaintiff does not identify by name the people who heard the alleged defamatory statement. *Id.* But, according to Plaintiff, the meeting's organizer, Roelof Havemann, the First Secretary of the Dutch Embassy, either heard the statement directly or got wind of it, because Havemann confirmed to Plaintiff what the "Checchi representative" had said. *Id.* Plaintiff suspects that the story eventually reached two potential employers because they did not hire him for open positions that he sought after his termination. *Id.* ¶ XXXIII(b).

### B. Procedural History

On March 10, 2017, Plaintiff, proceeding pro se, sued Defendant over his termination. *See* Compl., ECF No. 1. He amended his complaint approximately three weeks later. *See* Am. Compl., ECF No. 4. In response, Defendant sought a court order enjoining a related arbitration that Plaintiff had initiated. *See* Def.'s Mot. to Enjoin Arbitration, ECF No. 8, at 4–5. The court granted the motion

5

on May 4, 2017, finding that Plaintiff had waived his right to arbitrate by filing suit. *See* Mem. Op. and Order, ECF No. 15.

In turn, Plaintiff filed a Second Amended Complaint on May 9, 2017, which advanced additional allegations and named Checchi, Agee, and Gavagan as defendants. *See* Second Am. Compl. The Second Amended Complaint contains the following claims: (1) breach of contract and promissory estoppel; (2) tortious interference with contract and/or tortious interference with business expectancy; (3) discrimination in violation of Title VII violation, 42 U.S.C. § 2000e *et seq.*; (4) discrimination in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 *et seq.*; and (5) defamation. *Id.* Defendant Checchi answered on May 23, 2017, and filed a Motion for Judgment on the Pleadings that same day. Answer; Def.'s Mot. for J. on Pleadings, ECF No. 22 [hereinafter Def.'s Mot.], Def.'s Mem. of Points and Authorities in Supp., ECF No. 22-1 [hereinafter Def.'s Mem.]. That motion is now ripe for the court's consideration.

### III. LEGAL STANDARD

A party may move for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), after the pleadings are closed but early enough so as not to delay trial. Fed. R. Civ. P. 12(c). The standard for reviewing a motion for judgment on the pleadings is essentially the same as that for motions to dismiss under Rule 12(b)(6). *Brown v. Dist. of Columbia*, 249 F. Supp. 3d 439, 442 (D.D.C. 2017). The court construes the complaint in the light most favorable to the non-moving party and accepts as true all factual inferences drawn from well-pleaded factual allegations. *Coleman v. Dist. of Columbia*, 828 F. Supp. 2d 87, 90 (D.D.C. 2011). Judgment is appropriate when a complaint fails "to state a claim upon which relief can be granted." *Id.* (internal citation and quotation marks omitted). As with a motion to dismiss, the court should grant judgment on the pleadings if the facts alleged in the complaint do not "raise a right to relief above

the speculative level" or if they "fail to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). But while the granting of a motion to dismiss "typically merely means that the plaintiff has failed to satisfy one of the procedural prerequisites" when asserting a claim for relief, the granting of a motion for judgment on the pleadings "theoretically is directed towards a determination of the substantive merits of the controversy[.]" *United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 88 (D.D.C. 2017) (quoting 5C CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1369 (3d ed. 2017)). Consequently, courts grant motions under Rule 12(c) only when "it is clear that the merits of the controversy can be fairly and fully decided in this summary manner." *Id.* (quoting Wright et al., *supra*, § 1369)).

When evaluating a motion for judgment on the pleadings, the court may rely on the pleadings, the exhibits to the pleadings, and any judicially noticeable facts to assess whether the movant has met its burden. *See Allen v. U.S. Dep't of Educ.*, 755 F. Supp. 2d 122, 125 (D.D.C. 2010). Here, the court considers Plaintiff's Second Amended Complaint, the exhibits attached thereto, and Defendant's Answer.

## IV. DISCUSSION

### A. Title VII Claim

The court begins with Plaintiff's claim under Title VII. Plaintiff alleges that Defendant fired him because he is black and because he is a citizen of Congo, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. See* Second Am. Compl. ¶¶ IX; XXXI(a), (c), (d). Defendant seeks judgment on the pleadings as to that claim on the ground that Plaintiff, as a non-U.S. citizen who did not work in the United States, is not protected by Title VII.

7

Title VII prohibits discrimination in employment based on an "individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The statute's protections do not, however, extend to all persons who are employed by a covered employer. By its very terms, Title VII "affirmatively grants protection only to 'a citizen of the United States'" with respect to employment in a foreign country. *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 421 (D.C. Cir. 2005) (quoting 41 U.S.C. § 2000e(f)). Thus, United States citizens working for covered employers outside of the country fall within the protections of Title VII, *see* 42 U.S.C. § 2000e(f), but similarity situated non-United States citizens do not, 42 U.S.C. § 2000e-1(a); *see also* 29 C.F.R. § 1614.103(d)(4) (stating that "[a]liens employed in positions, or who apply for positions, located outside the United States" are not protected). A covered employer, therefore, cannot be subject to Title VII liability for discriminatory acts against a non-United States citizen employee working abroad.

A straightforward application of the foregoing principles compels dismissal of Plaintiff's Title VII claim. Plaintiff is a citizen of Congo who was employed by a United States corporation in Mali. Second Am. Compl. ¶ I. He therefore does not enjoy the protections of Title VII. *See Shekoyan*, 409 F.3d at 422 (concluding that non-resident foreign alien was outside Title VII's protections even though employer's hiring decision and subsequent employment decisions about the employee were made within the United States).

Plaintiff contends that because the Equal Employment Opportunity Commission ("EEOC") issued him a right-to-sue letter, instead of rejecting his claim outright, he is eligible for Title VII's protections. *See* Pl.'s Opp'n to Def.'s Mot. for J. on the Pleadings, ECF No. 25 [hereinafter Pl.'s Opp'n], at 23–24. But this argument misapprehends the meaning of a right-to-sue letter. The purpose of such a letter is merely to notify an employee that the EEOC has decided against filing a civil action on the employee's behalf. *See* 42 U.S.C. § 2000e-5(f)(1). An

8

employee's receipt of the right-to-sue letter also starts the time within which he must bring suit in federal court. 29 U.S.C. § 626(e). A right-to-sue letter cannot, however, confer rights that the statute does not. The letter Plaintiff received, therefore, does not grant him a Title VII claim. *See, e.g.*, *Boustany v. Xylem Inc.*, 235 F. Supp. 3d 486, 491–96, 498 (S.D.N.Y. 2017) (dismissing Title VII claim brought by non-U.S. citizen who was employed outside of the United States because the plaintiff was outside the reach of Title VII, even though plaintiff had received a right-to-sue letter).

### B. District of Columbia Human Rights Act Claim

Turning next to Plaintiff's claim under the District of Columbia Human Rights Act ("DCHRA"), Plaintiff alleges, as he does in his Title VII claim, that Defendant fired him because of his race and national origin in violation of the DCHRA, D.C. Code § 2-1402.11(a)(1). Second Am. Compl. ¶¶ XXXI(c); XXXII. Defendant asserts that Plaintiff cannot advance a discrimination claim under the DCHRA because that statute does not have "extraterritorial" application—that is, it does not have application outside the United States. *See* Def.'s Mem. at 10.

A discrimination claim can arise under the DCHRA when *either* the discriminatory employment decision was made in the District of Columbia *or* the effects of that discriminatory decision were felt in the in the District. *Monteilh v. AFSCME, AFL-CIO*, 982 A.2d 301, 304–05 (D.C. 2009). In *Monteilh*, the D.C. Court of Appeals considered whether a plaintiff who lived and worked outside of the District could bring a DCHRA claim against his District of Columbia-based employer. *Id.* at 301–02. The plaintiff "never performed any work, nor applied for any position, within the District of Columbia." *Id.* at 302. Yet, the court in *Monteilh* concluded that the plaintiff's claim fell within the scope of the DCHRA because his employer "ha[d] made a discriminatory decision in the District of Columbia, although the effects have been felt elsewhere." *Id.* at 304. The court explained that this interpretation of the DCHRA "is most faithful to the

9

statutory language and purpose." *Id*. The court observed that the statute's text announces a "broad prohibition" against discriminatory acts by employers and that the D.C. Council's intent in passing the statute was to eliminate discrimination in the District of Columbia. *Id*. "The gravamen of the statutory proscription is discrimination as defined; the happenstance of where the conduct works its consequences was not reasonably meant by the Council to be 'the critical factual issue.'" *Id*. (citation omitted). Thus, the court held that although merely alleging that an employer is headquartered in the District of Columbia or has offices here would not be enough to implicate the DCHRA, the DCHRA's protections apply so long as the alleged discriminatory decision is made in the District of Columbia, or its effects are felt here, or both. *Id*. at 305. Ultimately, in *Monteilh*, the court remanded the matter for further fact development.

Applying *Monteilh* here, Plaintiff has stated a claim under the DCHRA. Specifically, Plaintiff alleges facts that, if true, establish that Defendant's decision to terminate him was made within the District of Columbia. First, Plaintiff alleges that Gavagan, who investigated the altercation in Mali, "announced to me that Checchi Main Office in D.C." made the decision to terminate him. Second Am. Compl. ¶ XXVIII. Defendant admits this allegation. Answer ¶ XXVIII. Second, the October 20, 2016, termination letter suggests that the decision to fire Plaintiff was made in the District of Columbia. The letter was printed on company letterhead bearing a Washington, D.C., address and was signed by Defendant's Vice President, Agee, whose office Defendant admits is located at the company's Washington, D.C., address. Second Am. Compl. ¶¶ V, XXIX; Answer ¶¶ V, XXIX; Termination Letter. These allegations are sufficient, at this early stage of the litigation, to situate the alleged discriminatory act in the District of Columbia and therefore permit Plaintiff's DCHRA claim to proceed.

Defendant advances a number of arguments to support its view that the DCHRA does not have "extraterritorial" reach and therefore is inapplicable here. First, Defendant urges the court to interpret the DCHRA consistently with Title VII, as the D.C. Court of Appeals often does, and conclude that the DCHRA also does not to reach discrimination against non-U.S. citizens working abroad. Def.'s Mem. at 8–9. While it is true that the D.C. Court of Appeals generally follows cases construing Title VII when interpreting and applying the DCHRA, that practice holds true only insofar as the two acts "use similar words and reflect a similar purpose." *Estenos v. PAHO/WHO Federal Credit Union*, 952 A.2d 878, 886 (D.C. 2008). Here, following Title VII cases would be inappropriate because the text of the two statutes differ in a critical respect. While Title VII expressly excludes non-U.S. citizens employed in a foreign country from its definition of "employee," *see* 42 U.S.C. § 2000e(f), no such limitation exists in the DCHRA's definition of "employee," *see* D.C. Code § 2-1401.02(9) (defining an "employee" to mean "any individual employed by or seeking employment from an employer," except unpaid interns). Thus, cases interpreting Title VII's inapplicability to non-U.S. citizens abroad offer no guidance about how to interpret the applicability of the DCHRA to such persons.

Next, Defendant contends that the principle of statutory construction that presumes Congress did not intend for a federal statute to apply extraterritorially, unless a contrary intent appears, should be applied to legislation drafted by the D.C. Council. And, because the DCHRA contains no clear expression of an intent to apply beyond the territorial jurisdiction of the United States, Defendant maintains, the Act has no application in this case. Def.'s Mem. at 9 (citing *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010)). That interpretative principle, however, is not controlling here because Plaintiff is not asking the court to apply the DCHRA outside the territory of the United States. *See Envtl. Def. Fund, Inc. v. Massey*, 986 F.2d 528, 531

11

(D.C. Cir. 1993) (stating that "an extraterritorial application of a statute involves the regulation of conduct beyond U.S. borders"). To the contrary, Plaintiff's claim is that Defendant engaged in a discriminatory act—firing him because of his race and national origin—within the District of Columbia, where the termination decision was made. Accordingly, the presumption against extraterritorial application of federal law has no application here and thus does not support Defendant's preferred interpretation of the DCHRA. *See id.* (observing that "the presumption against extraterritoriality is not applicable when the conduct regulated by the government occurs within the United States").

Finally, Defendant points to the D.C. Council's expression of intent contained in the DCHRA as evidence of its limited application. Def.'s Mem. at 10. Specifically, Defendant cites two D.C. Code provisions: (1) D.C. Code § 2-1401.01, titled "Intent of Council," which provides that "[i]t is the intent of the Council of the District of Columbia, in enacting this chapter, to secure an end *in the District of Columbia* to discrimination for any reason other than that of individual merit" (emphasis added); and (2) D.C. Code § 2-1402.01, which states that "[e]very individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life *of the District* and to have an equal opportunity to participate in all aspects of life" (emphasis added). Defendant relies on the italicized portions of these provisions as evidence that the Council did not intend to apply the DCHRA beyond the District's borders. Def.'s Mem. at 10. The D.C. Court of Appeals, however, rejected that very argument in *Monteilh*. 982 A.2d at 304–05 (noting the defendant's argument invoked D.C. Code § 2-1402.01). It therefore gains no traction here.

Accordingly, the court concludes that the DCHRA reaches the discriminatory conduct alleged by Plaintiff. He therefore has stated a plausible claim under that statute.

12

### C. Defamation Claim

Next up is Plaintiff's defamation claim. Plaintiff alleges that Defendant defamed him when a "representative" of the company told unspecified attendees at the Rule of Law meeting held at the Dutch Embassy in Bamako, Mali, on November 25, 2016, that Plaintiff had been fired because he had assaulted his supervisor. Second Am. Compl. ¶ XXXIII(a). Although Plaintiff does not identify the attendee-listeners by name or position, he does allege the defamatory statement was made to various dignitaries and that the First Secretary of the Dutch Embassy, who convened the meeting, confirmed that Defendant had spread the story. *Id*. Defendant contends that Plaintiff's claim fails for lack of particularity.[2] Def.'s Mem. at 10–12.

To state a claim for defamation under District of Columbia law,[3] a plaintiff must allege: (1) the defendant made a false and defamatory statement concerning the plaintiff; (2) the defendant published the statement without privilege to a third party; (3) the defendant's fault in publishing the statement was at least negligent; and (4) either the statement was actionable as a matter of law irrespective of special harm, or that its publication caused special harm. *Rosen v. Am. Israel Pub. Affairs Comm.*, 41 A.3d 1260, 1256 (D.C. 2012). A statement is defamatory "if it tends to injure [the] plaintiff in his trade, profession or community standing, or lower him in the estimation of the

---

[2] Defendant appears to construe the Second Amended Complaint as containing two defamation claims: one, concerning Plaintiff's unsuccessful job applications, and the second concerning the statement allegedly made at the November 25, 2016, meeting. *See* Def.'s Mem. at 11. But Plaintiff's allegation concerning his unsuccessful job applications arise out of the statement at the November 25 meeting. *See, e.g.*, Second Am. Compl. ¶ XXXIII(b) ("I am of the view that such silence following my application . . . is a result of the change of perception on my person by the outgoing director following the slander of my name in the rule of law coordination meeting who in turn communicated the information [to] the people in charge of recruitment . . . ."). Therefore, the court only considers the alleged statement made at the Dutch Embassy as the basis for Plaintiff's claim.

[3] Notwithstanding the utterance of the alleged statement in Mali, the parties both assume that District of Columbia law applies. *See* Def.'s Mem. at 11 n.8; Pl.'s Opp'n at 26. "Generally, when the parties do not raise the issue of the applicability of foreign law, a court is under no obligation to apply foreign law and may instead apply the law of the forum." *Oparaugo v. Watts*, 884 A.2d 63, 70 (D.C. 2005) (quoting *Rymer v. Pool*, 574 A.2d 283, 285 (D.C. 1990)). In light of that general rule and the briefing on this issue, the court applies District of Columbia law to Plaintiff's defamation claim.

13

community." *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1241 (D.C. 2016) (alteration in original) (quoting *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000)).

Defendant argues that Plaintiff's claim falls short because Plaintiff has not identified the "allegedly false words," the name of the alleged speaker, and the names of the listeners who heard the statement. Def.'s Mem. at 12. Defendant believes these deficiencies are fatal to Plaintiff's claim because it reads District of Columbia law as requiring the pleading of defamation claims by alleging the time, place, content, speaker, and listener of a defamatory statement. *Id*. at 10–12.

This argument misses the mark. For starters, contrary to Defendant's reading of the law, the D.C. Court of Appeals has rejected the imposition of any heightened pleading standard with respect to defamation claims, including that the plaintiff identify the speaker and the listener. *See Clampitt v. Am. Univ.*, 957 A.2d 23, 43 (D.C. 2008); *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005); *see also Intelsat USA Sales Corp. v. Juch-Tech Inc.*, 935 F. Supp. 2d 101, 117–18 (D.D.C. 2013) (explaining that cases stating that District of Columbia law requires the "time, place, content, speaker, and listener" to state a defamation claim are mistaken). Rather, District of Columbia courts "focus . . . on whether 'the factual allegations in the appellant's complaint are sufficient to permit the opposing party to form responsive pleadings[.]'" *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009) (quoting *Oparaugo*, 884 A.2d at 76–77). Plaintiff readily has met that standard. More importantly, the pleading requirements under District of Columbia law are inapplicable because Plaintiff has filed suit in federal court, where the Federal Rules of Civil Procedure govern. *See* Fed. R. Civ. P. 1 ("These rules govern the procedure in all civil actions and proceedings in the United States district courts . . . ."). Under Rule 8(a), Plaintiff is required only to provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiff has satisfied this requirement. He has alleged that a representative of

Defendant told "all parties" at the November 25, 2016, Rule of Law meeting at the Dutch Embassy in Mali that Plaintiff was fired for assaulting a superior. Second Am. Compl. ¶ XXXIII(d)–(f). Plaintiff further avers that this statement was false, "made out of malice," and that no privilege applies to the statement. *Id.* ¶ XXXIII(c). Those allegations are sufficient to state a plausible claim of defamation and to give Defendant adequate notice of that claim. Plaintiff therefore may proceed with his defamation cause of action.

### D. Breach of Contract and Promissory Estoppel Claims

The court now moves to Plaintiff's contract and quasi-contract claims. First, Plaintiff alleges that by firing him, Defendant breached both an express contract and an implied-in-fact contract. His express contract claim is based on the Task Order, which states that the Mali Justice Project would run for either three or five years.[4] *Id.* ¶¶ XVIII n.3; XXX(a). Plaintiff contends that this rebuts any presumption that his employment was at will, and thus, that Defendant could not fire him without cause. *See id.* ¶ XXX(a). Plaintiff also alleges that Defendant breached an implied-in-fact contract that was created by Defendant's communications with him, including statements about his benefits and the responsibilities he would have. *Id.* ¶¶ XVIII, XXX(a)–(b). Finally, Plaintiff alleges a promissory estoppel claim, based on the promises that Defendant made to him about the length of his employment and the benefits he would receive. *Id.* ¶ XVIII.

To prevail on a breach of contract claim, a party must establish: (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach. *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). An implied-in-fact contract is "inferred from the conduct of the parties in the milieu in

---

[4] Construing Plaintiff's complaint liberally, as this court must, Plaintiff is alleging that he was a third-party beneficiary of the Task Order. *See Corp. Sys. Res. v. Wash. Metro. Area Trans. Auth.*, 31 F. Supp. 3d 124, 131–32 (D.D.C. 2014) (discussing when a non-party may bring a breach of contract claim as a third-party beneficiary to the contract). Defendant does not challenge that Plaintiff was a third-party beneficiary of the Task Order.

which they dealt." *Vereen v. Clayborne*, 623 A.2d 1190, 1193 (D.C. 1993) (citation omitted). Plaintiff's promissory estoppel claim is an alternative to his express contract claim. *See Daisley v. Riggs Bank*, 372 F. Supp. 2d 61, 71 (D.D.C. 2005) ("District of Columbia law presupposes that an express, enforceable contract is absent when the doctrine of promissory estoppel is applied." (citation omitted)). To allege promissory estoppel, a plaintiff must establish: (1) the existence of a promise, (2) that the promise reasonably induced reliance on it, and (3) that the promisee relied on the promise to his detriment. *Osseiran v. Int'l Dev. Fin. Corp.*, 498 F. Supp. 2d 139, 147 (D.D.C. 2007).

Defendant contends that the at-will provision in Article 8(D) of the Employment Agreement, which Defendant cited in its termination letter, dooms Plaintiff's claims. That provision states:

> Notwithstanding anything to the contrary, either party may terminate this contract with or without cause by written notice of at least thirty (30) days in advance, it being understood that in the event of a termination without cause by the Employee, the Employee shall forfeit all accrued leave.

Pl.'s Exs. at 3. Defendant further notes that Article 15 of the Employment Agreement states that the contract could be modified only via a signed writing, and Plaintiff has not alleged that such an instrument exists. Def.'s Mem. at 6–7; *see* Pl.'s Exs. at 4.

Defendant's argument, however, overlooks other critical language in the Employment Agreement and the Task Order. Article 14 of the Employment Agreement states that "[i]n the event of a conflict between the [Task Order] and this Agreement, the [Task Order] shall control." Pl.'s Exs. at 4. Here, there is at least an arguable conflict between the termination conditions in the Employment Agreement and those in the Task Order as they relate to Plaintiff. Although the Employment Agreement allows Defendant to unilaterally end Plaintiff's employment for any

16

reason, the Task Order would appear to impose more stringent requirements for termination. Under clause F.7 of the Task Order, Plaintiff is designated as one of four "key" personnel. Pl.'s Exs. at 8. As to such persons, the Task Order requires Defendant to notify USAID before replacing any of those employees and to "submit written justification (including proposed substitutions) in sufficient detail to permit evaluation of the impact on the contract." *Id*. The Task Order further states that "[n]o replacement may be made by the Contractor without the written consent of the Contracting Officer." *Id*. Both parties are silent as to whether Defendant submitted the required written notice and justification and whether USAID approved the personnel decision. Thus, at this stage of the litigation, it is plausible that the Task Order's language controls, and that Defendant breached its express contract with Plaintiff when it terminated him. Therefore, the court denies Defendant's motion on Plaintiff's express contract claim.[5]

### E. Tortious Interference with Contract and Business Expectancy Claims

That leaves for last Plaintiff's tortious interference with contract and tortious interference with business expectancy claims.[6] Defendant does not formally seek judgment with respect to that claim, explaining that it did not do so because the pertinent portion of the Second Amended Complaint only names Agee and Gavagan—not Checchi—and therefore the claim lies only against

---

[5] Because the court has found a plausible claim for breach of an express contract, it need not consider at this stage Plaintiff's alternative implied-in-fact contract and promissory estoppel claims. The court construes those claims as alternatives to his express contract claim because both deal with the length and conditions of his employment. *See Casciano v. JANSEN Rides, LLC*, 109 F. Supp. 3d 134, 141 n.2 (D.D.C. 2015) (stating "that the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter" (quoting *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2012))); *Plesha v. Ferguson*, 725 F. Supp. 2d 106, 112 (D.D.C. 2010) (stating that District of Columbia courts generally prohibit the claim of promissory estoppel when there is an express contract governing the parties' conduct).

[6] The Second Amended Complaint does not make clear whether Plaintiff is alleging a tortious interference with contract claim, a tortious interference with business expectancy claim, or both. Defendant assumes Plaintiff intends to state the former, *see* Def.'s Reply to Pl.'s Opp'n, ECF No. 27, at 2 n.3, while Plaintiff contends he has alleged both, *see* Pl.'s Opp'n at 1. In light of Defendant's briefing, the court need not decide whether Plaintiff is proceeding under one or both theories.

the individual defendants, neither of whom have been served. *See* Def.'s Reply to Pl.'s Opp'n, ECF No. 27, at 2 n.3; *see also* Second Am. Compl. ¶ XXX(d).

Defendant's reading of the Second Amended Complaint is too narrow. This court is obligated to construe liberally documents filed by pro se plaintiffs. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Construing the Second Amended Complaint in that way, Plaintiff has stated a tortious interference claim against Defendant under a respondeat superior theory of liability. This theory allows an employer to "be held liable for the acts of his employees committed within the scope of their employment." *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 757 (D.C. 2001) (citation omitted). Plaintiff alleges that "Gavagan and Agee should be liable for their own torts, *in addition to the tort of Checchi Consulting as a corporation*, even if they were just agents acting on behalf of their employer." Second Am. Compl. ¶ XXX(d) (emphasis added). Construing that allegation liberally, Plaintiff seeks to hold not only Agee and Gavagan liable for their individual tortious acts, but also Defendant Checchi under a theory of respondeat superior liability. Plaintiff's tortious inference claim therefore may proceed against Defendant Checchi.

## V. CONCLUSION AND ORDER

For the foregoing reasons, Defendant's Motion for Judgment on the Pleadings is granted as to Plaintiff's Title VII claim. That claim is dismissed with prejudice. Defendant's Motion is denied with respect to all other claims.

Dated: December 1, 2017

Amit P. Mehta
United States District Judge